J-S30043-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
v.               :
:
:
BRANDON MEADE          :
:
Appellant      :  No. 1961 EDA 2021

Appeal from the PCRA Order Entered September 9, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011126-2015

BEFORE:  STABILE, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:      **FILED SEPTEMBER 23, 2022**

Brandon Meade (Meade) appeals from the order entered in the Court of Common Pleas of Philadelphia County (PCRA court) denying his petition filed pursuant to the Post-Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546.  He alleges the PCRA court erred in denying his petition where trial counsel was ineffective.  We affirm.

We take the following factual background and procedural history from this Court's June 18, 2018 memorandum opinion in Meade's direct appeal, the PCRA court's November 24, 2021 opinion, and our independent review of the record.

---

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

On November 6, 2015, the Commonwealth filed an Information charging Meade with first-degree murder and possessing an instrument of crime (PIC)[1] for fatally shooting his paramour, Agatha Hall (the decedent), on August 31, 2015. The case proceeded to trial on September 21, 2016.

The Commonwealth's theory of the case was that Meade "shot the decedent in a fit of jealous rage after discovering that she had contact with her former boyfriend. Thereafter, [Meade] was exiting the apartment when he came upon the decedent's roommate and her boyfriend, whereupon he returned and fired a second shot into the wall and staged a suicide." (PCRA Court Opinion, 11/24/21, at 7). Meade's "position was that the decedent was depressed as a result of her mother's death months earlier and committed suicide with [his] gun." (***Id.***).

**A.**

This Court thoroughly set forth the facts adduced at trial in our June 18, 2018 memorandum opinion as follows:

> Agatha Badio is the decedent's aunt. … Badio had spoken with the decedent for the last time a few days before her murder and testified that she was planning to come to Minnesota to visit her family in the week following her death. According to Badio, the decedent was happy the last time she spoke to her and in the months preceding her murder. [On cross-examination, she agreed the decedent was depressed over the death of her mother

---

[1] 18 Pa.C.S. §§ 2502(a) and 907(a), respectively.

because, "[w]ho wouldn't be[,]" but clarified on re-direct that the decedent was not depressed, and in fact seemed happy.]

Robert Lay testified that he is a registered coordinator at Temple University. He was a friend of the decedent. They met in the fall of 2014 and commenced a sexual relationship which lasted for that semester and after which they remained friends. Lay described the decedent as "very bubbly ... always smiling, always joking." After that semester, during the winter break, the decedent had gone to Australia to see her mother, who was ill. Her mother passed away during the trip. Lay kept in touch with the decedent while she was in Australia and testified that, although she was upset about her mother's death, she was also relieved that her mother's illness was over and was "back to her bubbly state" upon returning from the trip. Lay added that the decedent did not want to continue seeing him after the trip because she had entered into a relationship with someone else.

Lay testified that they did have one more sexual encounter about a month after she started this new relationship. Two or three days after this encounter, he received a frantic phone call from the decedent. She sounded scared and worried; she told him that her boyfriend had gone through her text messages, and she kept asking if her boyfriend had tried to contact him. The second-to-last phone call between Lay and the decedent took place at the end of June, 2015. At the time of the phone call, the decedent seemed very happy and she said she was doing very well. Their final phone call was a Sunday night in late August, 2015. … She initially seemed calm but then started whispering "call you back, call you back" and gave Lay the impression that she was worried, scared, and that there was something wrong before she hung up. After this phone call, he received a phone call from the decedent's number but it was a man who was yelling at him, cursing, and threatening him. … [He heard the decedent yell not to say anything and then exhale as if the wind had been knocked out of her.] The following day, upon hearing that the decedent had committed suicide, Lay went to Temple Police Station and gave them a statement because he did not think the decedent had killed herself.

Abigail Osei–Tutu was the decedent's roommate [since] August of 2014. … She [] testified that … the condition of the decedent's bedroom as shown in the photographs taken of the scene was not how the decedent kept it; rather, it was much too

messy. … She had never noticed a bullet hole in the decedent's bedroom wall prior to the murder. Osei–Tutu knew [Meade] as the decedent's boyfriend, whom the decedent had started dating upon returning from Australia in the winter of 2015.

Osei–Tutu testified that the decedent had been considering marrying a friend so that he would not lose his visa, but after the decedent spoke to [Meade] about it on the phone, the decedent spent the rest of the evening crying and very upset. [S]he went to her bed and put about five over-the-counter (*i.e.* Tylenol, etc.) painkillers in her mouth and then spit them right back out. A couple of days after this incident, the decedent seemed normal to Osei–Tutu and was excited about the start of the fall semester.

Osei–Tutu testified that on August 31, 2015, she and her boyfriend, Daniel Boateng, were returning to her apartment … when they encountered [Meade] opening the door to the vestibule (from the hallway), apparently on his way out of the building. He appeared startled, did not say anything to Osei–Tutu or her boyfriend, turned around, and started banging on the decedent's bedroom door [angrily demanding his gun that he said he left behind.] Osei–Tutu and Boateng went to the former's room and sat on her bed. Within a few seconds, [Meade] stopped banging on the door and, a few seconds after that, Osei–Tutu and Boateng heard a gunshot. After the gunshot Osei–Tutu testified that she heard [Meade] start yelling "Why did she do that? Why did she do that? Oh my god!"

After the gunshot, … [Meade] then came into [Osei-Tutu]'s room, still yelling, … and Osei–Tutu [and Boeteng] ran out of the apartment. ... Osei–Tutu called the police to report [the shooting. She] went to the police station with the police that morning and gave a statement, which she reviewed and signed. She gave an additional two statements to homicide detectives: one on September 9, 2015 and another on May 3, 2016.

Daniel Boateng testified that he is the boyfriend of Abigail Osei–Tutu. He described the decedent as a very easy-going and joyful person. ... Boateng testified [consistently with Osei-Tutu about the events of the night of August 31, 2015, adding only that he heard a slight murmur (the gender of which he could not determine) after Meade pounded on the decedent's door

- 4 -

demanding his gun,[2] and that after the shooting, he saw that Meade had blood stains at the top of his shirt. When Boateng left the room, Meade] was flailing on Osei–Tutu's bed saying: "I can't believe she did that to herself!"

Giselle Spencer, a close friend of the decedent, testified that she had known the decedent for three years. … The decedent continuously told Spencer that [Meade] had a temper and did not trust her. On May 29, 2015, the decedent called her sounding hysterical. The decedent told her that [Meade] had found messages on her phone from another male and that they had had a big fight, after which [Meade] had slammed her against a wall. …

Spencer further testified that, in the summer of 2015, she went to the mall with the decedent and [Meade]. … Two males came out of a store and made flirtatious remarks directed at the decedent. [Meade] walked up and lifted his shirt revealing a gun to the males. The decedent asked Spencer to go get [Meade] away from the males because he had a bad temper.

Spencer testified that [when she] hung out with the decedent about a week before she was murdered[,] the decedent was happy and excited about starting school the following week and finishing college.

\* \* \*

[Philadelphia Police] Officer Market testified that when he entered the apartment [minutes after the incident] there were clothes and debris scattered around. He also noticed that a mirror on the[bedroom] wall was tilted. [In the bedroom,] [h]e pulled an Ikea-style dresser off of the decedent and found her in a fetal position …. She was bleeding profusely from a wound on her forehead[.] … Officer Market found a gun with blood on it laying next to the decedent.

Officer Market testified that … [h]e found one fired cartridge casing (FCC) in the middle of the bed among some clothes and

---

[2] Meade's counsel impeached Ms. Osei-Tutu and Boateng with prior conflicting statements made to the police about whether they heard another voice before the gunshot. (*See* N.T. Trial, 9/22/16, at 73-74, 97-98, 137-38, 146-47).]

noticed a bullet hole in the wall about four feet above the bed. When [Meade] was brought to the district precinct for questioning, he continued to act hysterical and rolled on the floor in the hallway.

\* \* \*

Officer Willie Roundtree testified that he and his partner, Officer [Jonathan] Mangual, responded to a police radio call at 12:35 a.m. on the morning of August 31, 2015. Officer Roundtree testified that when he arrived on the scene, [Meade] was pacing back and forth in the back yard of the property and tried to walk away when approached by Officers Roundtree and Mangual. … Officer Roundtree then asked if the decedent was suicidal before and [Meade] said: "No, she never was. Am I able to leave? Am I able to leave? That was my baby. Oh my God, oh my God." …

[Officer Roundtree testified that he placed Meade in the squad car, and Officer Mangual called their supervisor to ask for clarification as to where to take [him]. The Assistant District Attorney (A.D.A.) asked Officer Roundtree to "tell us what you heard your partner sitting down next to you say into the phone." Officer Roundtree responded, "my partner said, sergeant, we are on our way to homicide. I don't believe this guy. He's not crying." (N.T. Trial, 9/22/2016 at 160). When Meade's trial counsel objected to this testimony on the grounds of hearsay, the objection was overruled. (*See id.* at 158-62).]

\* \* \*

Dr. Sam Gulino, the Chief Medical Examiner for the City of Philadelphia, testified that … [a]fter reviewing all of the files and photographs related to the autopsy of the decedent, … within a reasonable degree of scientific certainty, [the decedent's] cause of death was a gunshot wound to the head and her manner of death was homicide. … Dr. Gulino testified that the gun that fired the bullet that killed the decedent was fired at a distance of one to three feet from the decedent's head. … Dr. Gulino testified that none of the features of the decedent's case were typical of a suicide and that suicidal gunshot wounds are almost always contact wounds, which this was not.

Ms. Ann Marie Barnes, Firearms Examiner with the Philadelphia Police Department, testified that … [b]ased upon her

microscopic investigations, [she] determined that the bullet fragments found in the decedent's skull and the FCC found on the decedent's bed were fired from [Meade]'s 9mm Ruger gun. … The shot that killed the decedent was fired from a distance of fifteen (15) to twenty-two (22) inches from her head.

Ms. Barnes testified that [i]f [Meade] was standing above the decedent when he fired the gun at her, the FCC would have likely discharged onto the bed, which is where it was found. Ms. Barnes took distance determination test shots with [Meade's] 9mm Ruger gun at distances of 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, and 24 inches in order to determine the distance of the muzzle of the gun from the decedent. … The 18 to 22 inch distance determination range was the closet match to the stippling pattern on the decedent's head. Ms. Barnes testified that, after examining the body of the decedent, she determined that the farthest distance the decedent could have possibly held the muzzle of the gun from her head, when considering the decedent's arm length, was between 13.75 and 14 inches.

(***Commonwealth v. Meade***, 2018 WL 3015358, unpublished memorandum, at \*1-\*6 (Pa. Super. filed June 18, 2018) (record citation omitted)).

On September 27, 2016, the jury convicted Meade of first-degree murder and PIC. The court sentenced him that day to the mandatory term of life without the possibility of parole for the first-degree murder conviction and imposed no further penalty for PIC. This Court affirmed the judgment of sentence[3] on June 18, 2018, and the Pennsylvania Supreme Court denied his petition for allowance of appeal. (***See Commonwealth v. Meade***, 193 A.3d

---

[3] Meade challenged the sufficiency and weight of the evidence and the admission of prior bad acts evidence. He maintained, in part, that the verdict was against the weight of the evidence because there was evidence of the decedent's depressed state due to her mother's death. However, the issue was waived for his failure to preserve it.

1085 (Pa. Super. filed June 18, 2018) (unpublished memorandum), *appeal denied*, 199 A.3d 331 (Pa. 2018)).

Meade filed a counseled PCRA petition on March 3, 2020, an amended petition on October 15, 2020, and a supplemental petition on November 9, 2020. He claimed, in pertinent part, that trial counsel was ineffective for failing: (1) to argue that Officer Roundtree's testimony about Officer Mangual's statement that he did not believe Meade was inadmissible as improper credibility evidence; (2) to introduce the decedent's Facebook posts or subpoena family and friends she confided in through the platform because it would have supported the defense theory that she was suicidal; and (3) to call Meade's mother, Janice Meade, to testify about the decedent's statements that she was suicidal.

Appended to the amended petition was a "voluminous set of records" recovered from the decedent's Facebook account, including messages between the decedent and various friends and family members in which she expressed "varying degrees of sadness and grief regarding the death of her mother …, as well as stress and frustration brought on by financial difficulties." (PCRA Court Opinion, 11/24/21, at 11); (**see** Amended PCRA Petition, 10/15/20, at 5-13, Exhibit A, RR 33a-119a).[4] Also attached was

---

[4] We refer to the reproduced record for ease of reference because the Facebook records are nearly ninety pages long.

correspondence from Meade's brother, Kyle Gibson, in which he stated that he saw the decedent approximately a week before her death and that her affect was "blank" and she "wasn't mentally present," which was uncharacteristic. (**See** Amended PCRA Petition, at Exhibit D). The supplemental PCRA petition attached a transcript of PCRA counsel's email to Janice Meade in which he asked her a series of questions to which she provided answers. Specifically, she said that she told trial counsel that she received a text from the decedent's cousin that the decedent was suicidal, and that she had spoken to the decedent approximately a week before her death and that she was emotional over the death of her mother and cousin,[5] financial issues and college. Ms. Meade stated that in response to the decedent's concerns, she told her she needed to go to school to have something to keep her mind busy and gave her information about a suicide hotline. (**See** PCRA Petition Supplement, 11/09/28, at Attachment ¶¶ 6-7, 12-13).

On July 21, 2021, the court issued Rule 907 notice of its intent to dismiss Meade's PCRA petition without a hearing. **See** Pa.R.Crim.P. 207(1). On September 9, 2021, the PCRA court dismissed the petition. Meade timely appealed and filed a court-ordered statement of errors. **See** Pa.R.A.P. 1925(b).

---

[5] It is not clear who the cousin was.

On appeal, Meade argues that the PCRA court erred in dismissing his petition where trial counsel was ineffective for: (1) failing "to object to improper and prejudicial testimony" by Officer Roundtree; (2) failing "to present favorable defense evidence" in the form of Facebook records and testimony of the decedent's friends and family identified therein; and (3) failing "to call a [Meade's mother, Janice Meade, as a] favorable defense [witness]." (Meade's Brief, at 2).[6]

## II.

## A.

In considering an ineffective assistance of counsel claim, we observe first that counsel is presumed effective and that a petitioner bears the burden to prove otherwise. **See Commonwealth v. Fears**, 86 A.3d 795, 804 (Pa. Super. 2014). To establish an ineffectiveness claim, a defendant must prove:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) [Meade] suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.

**Id.** (citation omitted). "Failure to prove any prong of this test will defeat an ineffectiveness claim." **Id.**

---

[6] Our standard of review of the denial of a PCRA petition is whether the record supports the court's findings of fact and is free of legal error. **See Commonwealth v. Chambers**, 852 A.2d 1197, 1198 (Pa. Super. 2004), *appeal denied*, 871 A.2d 188 (Pa. 2005).

A reviewing court will examine the basis for counsel's actions only if it is first persuaded that the claim of ineffectiveness has arguable merit. ***Commonwealth v. Pursell***, 724 A.2d 293, 304 (Pa. 1999). For the second prong of the standard, a party must demonstrate that counsel's strategy was "so unreasonable that no competent lawyer would have chosen that course of conduct." ***Commonwealth v. Chmiel***, 889 A.2d 501, 541 (Pa. 2005) (citations omitted). "A reviewing court will find an attorney's strategy unreasonable only if an unchosen alternative would offer a substantially greater potential for success than that actually chosen." ***Commonwealth v. Lawrence***, 165 A.3d 34, 41 (Pa. Super. 2017) (citations omitted).

Finally, the Pennsylvania Supreme Court has consistently held that if the party asserting the claim fails to establish the prejudice prong, the claim may be dismissed on that basis alone without a determination of whether the party has met the first two prongs. ***See Chmiel***, 889 A.2d at 540. The defendant must demonstrate that "there is a reasonable probability that the result of the proceeding would have been different absent [counsel's] error." ***Commonwealth v. Lesko***, 15 A.3d 345, 373 (Pa. 2011).

With these legal principles in mind, we turn to Meade's ineffectiveness of counsel claims.

**B.**

Meade first argues that trial counsel was ineffective for objecting to Officer Roundtree's testimony that Officer Mangual said he did not believe

- 11 -

Meade because he was not crying based on hearsay instead of as inadmissible opinion testimony about his credibility. (*See* Meade's Brief, at 8). He maintains that trial counsel did not have a reasonable basis where the testimony unduly prejudiced him. (*See id.* at 8-11).

In support of this claim, Meade relies in large part on *Commonwealth v. McClure*, 144 A.3d 970 (Pa. Super. 2016) for the proposition that, "[i]t is an encroachment upon the province of the jury to permit admission of [a police officer's] testimony on the issue of the credibility of a witness." *McClure*, 144 A.3d at 977 (citation omitted); (*see* Meade's Brief, at 8-11). However, *McClure* is procedurally and factually distinguishable.

In *Commonwealth v. R.L.J.*, 241 A.3d 362 (Pa. Super. filed Oct. 2, 2020) (unpublished memorandum),[7] a PCRA appeal, we distinguished *McClure*, in part, because it "was decided in the context of a direct appeal, rather in a collateral context addressing any strategic decisions made by trial counsel." *R.L.J.*, 241 A.3d at *12. We observed that the court had instructed the jury that it was within their province to weigh the evidence and assess credibility and considered the "multitude of evidence" presented by the Commonwealth before concluding that petitioner had failed to establish he

---

[7] We may rely on unpublished decisions filed after May 1, 2019, as persuasive authority. *See* Pa.R.A.P. 126.

was prejudiced by his trial counsel's failure to object to the admission of the officer's opinions regarding petitioner's credibility. *See id.*

Similarly, here, the trial court repeatedly instructed the jury that it was its duty to assess credibility and provided a lengthy discussion about witness credibility and the factors it could consider when evaluating the evidence. (*See* N.T. Trial, 9/20/16, at 10); (N.T. Trial, 9/27/16, at 3-4, 11-16, 130-31, 133-34). Furthermore, the Commonwealth presented a "multitude of evidence" negating suicide and proving that Meade murdered the decedent in a jealous rage, in the form of forensic evidence and witness testimony about the decedent's demeanor and his violent history towards her.

Specifically, Mr. Lay, Ms. Spencer, Ms. Osei-Tutu, Mr. Boateng and Ms. Badio all testified about the decedent's sunny, happy disposition and her plans for the future. (*See* N.T. Trial, 9/21/16, at 80, 82-83, 181-82, 190); (N.T. Trial, 9/22/16, at 21-22, 105, 231). They testified that although she was sad at the passing of her mother in January 2015, she also was relieved and returned to her cheerful disposition soon thereafter. (*See* N.T. Trial, 9/21/16, at 82-83, 179, 181-82). Ms. Spencer testified about witnessing Meade's jealous, violent demeanor toward decedent and the decedent's fear of him. (*See* N.T. Trial, 9/22/16, at 216-17, 220-229). The decedent contacted Mr. Lay with concerns about Meade's anger and jealousy and her fear. In the final call between them on the night of the murder, she sounded afraid, and Meade screamed, cursed and threatened him before Mr. Lay heard the decedent yell

for him not to say anything and sharply exhale before the line went dead. (**See** N.T. Trial, 9/21/16, at 184-85, 193-97, 183-203). Although Ms. Osei-Tutu testified that the decedent was distraught after an argument with Meade and that she took a handful of Tylenol pills, she immediately spit them out and she was fine thereafter, excited about school and graduation. (**See** N.T. Trial, 9/22/16, at 18-22).

Ms. Osei-Tutu and Mr. Boateng testified about Meade's suspicious behavior on the night in question. (**See id.** at 26-28, 30, 55-57, 73-74, 110). They testified that they only heard one shot, although police found evidence of two bullets in the decedent's room. (**See** N.T. Trial, 9/21/16, at 252-53, 256-57). Officers Market and Roundtree testified about Meade's suspicious behavior at the scene, acting hysterical without tears and repeatedly asking to retrieve his gun, even attempting to crawl through Officer Waymack's legs while she was in the doorway. (**See id.** at 98, 101-02); (N.T. Trial, 9/22/16, at 157-62; 184).

Chief Medical Examiner Gulino testified to a reasonable degree of scientific certainty that the decedent was murdered based on the location of the entrance wound and distance from which the bullet was fired. (**See** N.T. Trial, 9/23/16, 12-13, 20-22, 33-34). Multiple witnesses testified about the forensic evidence and the fact that it supported a conclusion that Meade shot the gun two times from approximately eighteen to twenty inches away, not that the decedent shot herself based on the stippling pattern to her head, the

distance and angle from which the gun would have to have been shot, and the location of the FCC on her bed. (**See** N.T. Trial, 9/21/16, at 129, 139-40); (N.T. Trial, 9/23/16, at 33, 89-91, 103-05); (N.T. Trial, 9/26/16 at 20-26).

Based on the "multitude of evidence" presented by the Commonwealth, in addition to the trial court's instruction to the jury that it was within their province to weigh the evidence and assess credibility, the record supports the PCRA court's conclusion that Meade is unable to prove he was prejudiced by trial counsel's failure to object to Officer Roundtree's passing reference and, thus, his ineffectiveness of counsel claim fails. **R.L.J.**, 241 A.3d at *12.

## C.

In his next two issues Meade claims that the court erred in denying his PCRA petition because trial counsel was ineffective for failing to use the decedent's Facebook records, subpoena her friends and family identified therein or call Meade's mother, Janice Meade, to testify that the decedent told her in the days before her death that she did not want to live anymore. He maintains this evidence would have established that the decedent was suicidal for weeks before her death and, therefore, he did not murder her. (**See** Meade's Brief, at 12-19).

The PCRA court explains that trial counsel was not ineffective for failing to introduce this cumulative evidence and Meade was not prejudiced where there was more than sufficient evidence to convict him. (**See** PCRA Ct. Op., at 11, 13). We discern no abuse of discretion.

It is long settled that "[t]rial counsel cannot be deemed ineffective for failing to present additional evidence cumulative of that already presented." ***Commonwealth v. Mason***, 130 A.3d 601, 634 (Pa. 2015). Further:

> As it specifically relates to a claim for ineffectiveness for the failure to call a witness, the petitioner must establish that (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. … Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. A claim of ineffectiveness generally cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued.

***Commonwealth v. Weimer***, 167 A.3d 78, 92 (Pa. Super. 2017) (citations, quotations marks, brackets and emphasis omitted).[8]

In Janice Meade's written response to questions from PCRA counsel attached to the supplemental PCRA petition, she represented, in pertinent part, that she told trial counsel that (1) she spoke to the decedent's cousin, who told her that the decedent had texted that she wanted to kill herself; and

---

[8] Meade failed to provide affidavits from the decedent's friends and family or from his mother (or his brother) in which they stated that they were willing and able to testify on his behalf. ***See Weimer***, 167 A.3d at 92 ("Ineffectiveness for failing to call a witness will not be found where a defendant fails to provide affidavits from the alleged witnesses indicating availability and willingness to cooperate with the defense."). However, the PCRA court denied these issues on its merits and, therefore, we will review the merits of these claims.

(2) that she saw the decedent days before the murder and that she gave her information on suicide hotlines and told her she needed to get back to school to take her mind off the situation of her mother's death. (*See* Supplemental PCRA Petition, 11/09/20, at attachment ¶¶ 6-8, 12).

Regarding the Facebook records, we note that contrary to Meade's claim that both they and the unpresented testimony about them would have demonstrated that the decedent was "tragically suicidal," our review confirms that the records show the decedent communicating the normal grief experienced by an individual who recently experienced a close death in the family and her friends and family offering affection and emotional support. (*See* R.R. 46, 62, 95). In fact, the communications show that the decedent was making plans for the future, including returning to college the following week, being excited for her upcoming graduation and planning to attend law school. (*See* R.R. 38, 93-94).

The jury was aware that the decedent was upset over her mother passing away in January 2015. (*See* N.T. Trial, 9/21/15, at 182). Trial counsel cross-examined the decedent's aunt about the alleged depression this caused for the decedent. (*See id.* at 82-83). Mr. Lay testified about the decedent's emotional state due to her mother's illness. (*See id.* at 181-82). Ms. Osei-Tutu testified that one week before the murder, she witnessed the

decedent swallow several over-the-counter pain pills (described as Tylenol) before quickly spitting them back out.[9]  (**See** N.T. Trial, 9/22/16, at 18-19).

Therefore, Janice Meade's testimony on behalf of her son and the Facebook records to this affect, although potentially relevant, were merely cumulative, and counsel cannot be ineffective for failing to introduce cumulative evidence.  **See Mason**, 130 A.3d at 634.  Additionally, as detailed in section IIB above, the physical and scientific evidence and testimony of the decedent's friends and aunt overwhelmingly established that her death was not a suicide.  Therefore, even if this testimony and evidence was not cumulative, Meade was not prejudiced by trial counsel's decision not to pursue this strategy, and we will not compare, in hindsight, this decision not to produce voluminous Facebook records, call Meade's mother to testify or subpoena the decedent's friends and family with alternatives not pursued. Counsel's trial strategy was not so prejudicial as to deny Meade a fair trial. **See Weimer**, 167 A.3d at 92.  He is due no relief.

Order affirmed.

---

[9] The record reflects this incident was the result of an argument with Meade, not due to the decedent's sadness over her mother's passing.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/23/2022</u>